**NORTH SLOPE BOROUGH, Appellant,**

v.

**Robert LeRESCHE, Commissioner of Alaska Department of Natural Resources, Michael C. T. Smith, Director, Division of Lands, Alaska Department of Natural Resources and the State of Alaska, Appellees.**

**No. 3275.**

Supreme Court of Alaska.

Aug. 4, 1978.

---

Charles K. Cranston, Gallagher, Cranston & Snow, Anchorage, for appellant.

Rodger W. Pegues, Asst. Atty. Gen., Avrum M. Gross, Atty. Gen., Juneau, for appellees.

J. W. Sedwick, Burr, Pease & Kurtz, Anchorage, for Matanuska-Susitna Borough, Robert L. Hartig, Cole, Hartig, Rhodes, Norman & Mahoney, Anchorage, for Kodiak Island Borough, amici curiae.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, BURKE and MATTHEWS, Justices.

## OPINION

MATTHEWS, Justice.

Under Alaska law [1] a borough or city may select ten percent of the "vacant, unappropriated, unreserved state land located within its boundaries." On May 29, 1973, the North Slope Borough filed applications to select state lands which overlay the Prudhoe Bay oil field.[2] After a delay of seven months,[3] the applications were rejected by

---

1. AS 29.18.190 provides:

    *State land.* A borough or city may select 10 per cent of the vacant, unappropriated, unreserved state land located within its boundaries. In the selection of land under the Alaska Statehood Act, it is the policy of the state to make available to cities and boroughs the maximum land area from which to make selections under this section consistently with the best interests of the state. Nothing in this section affects a valid existing claim, location, or entry under the laws of the state or the United States whether for homestead, mineral, right-of-way or other purpose or affects the rights of an owner, claimant, locator, or entryman to the full use and enjoyment of the land so occupied.
    AS 29.18.200 provides:

    *Selection procedure.* (a) All selections must be made in reasonably compact tracts, taking into account the situation and potential uses of the land involved. The authority to make selections may not be alienated or bargained away, in whole or in part, by the borough or city.

    (b) If land desired by the borough or city is unsurveyed at the time of its selection, the Department of Natural Resources shall survey or approve a survey by the borough or city of the exterior boundaries of the area requested without interior subdivision and shall issue a patent for the selected area in terms of the exterior boundary survey. The cost of survey is borne by the borough or city. If land desired by the borough or city has been surveyed at the time of its selection, the boundaries of the areas requested must conform to the public land subdivisions established by the approval of the survey. Land selected by the borough or city under this chapter is patented to the borough or city by the Department of Natural Resources.

    (c) After the selection of the land by the borough or city but before the issuance of final patent, the borough or city may execute conditional leases and make conditional sales of selected land.

2. Only surface rights were to be conveyed by the selection. Mineral rights are reserved to the state under Section 6(i) of the Statehood Act, 72 Stat. 339 (1958).

3. The unreasonable delay in processing the Borough's selection applications may be attributed, in part, to the absence of any regulations prescribing how such applications should be processed. For purposes of expedition, and in order to assure uniform compliance with minimum notions of procedural due process, we encourage the promulgation of such regulations.

the Director of the Division of Lands who stated:

The area has been appropriated by the state by various uses not compatible for transfer to the North Slope Borough. Therefore, it is in the best interest of the state to reject lands as shown below.

The Borough appealed to the Commissioner of Natural Resources. On March 28, 1973, the Commissioner affirmed the decision of the Director. The Commissioner found that the lands were not vacant, unappropriated or unreserved.[4] In addition, he determined that it was not in the best interests of the State to convey the lands to the Borough.[5]

The Borough then appealed to the superior court which held that, while the lands were available for selection under AS 29.-18.190,[6] the Commissioner could properly deny the application on the basis that conveyance to the Borough was contrary to the best interests of the State. The superior court found that:

The state's interest in managing the Prudhoe Bay oil and gas fields, the locus of the Borough's land selection, was a reasonable basis for denying the selections.

## I

██ The first issue for decision is whether the Commissioner has the authority to reject a selection application on the grounds that it is inconsistent with the best interests of the State. We conclude that the Com-

missioner has the authority to make such a decision.

We have noted several times the high value which the framers of the Alaska Constitution placed on the state's land resources. *Moore v. State,* 553 P.2d 8, 30–32 (Alaska 1976) (separate opinion); *McCarrey v. Commissioner of Natural Resources,* 526 P.2d 1353, 1357 (Alaska 1974); *Alyeska Ski Club v. Holdsworth,* 426 P.2d 1006, 1011 (Alaska 1967). Article VIII, Section 10 of the Alaska Constitution provides:

No disposals or leases of state lands, or interests therein, shall be made without prior public notice and other safeguards of the public interest as may be prescribed by law.

In accordance with this provision, the first Alaska state legislature enacted the Alaska Land Act, AS 38.05, which contains at least two provisions requiring that any disposition of lands be consistent with the best interests of the State. AS 38.05.035, as it existed in 1973, authorized the approval of contracts for the sale, lease or other disposal of state lands, upon a finding that "the interests of the state will best be served." In addition, AS 38.05.285 requires that all disposals of state lands be "consistent with the public interest." Further, AS 38.05.-035(a)(7) provides that the Director of the Division of Lands shall·

have jurisdiction over state lands . .; to this end the director possesses the pow-

---

**4.** *The Commissioner indicated that some of the lands had been appropriated for use by the State or third parties including the lessees and the remainder had been reserved by the Division of Lands to ensure their availability for management or disposal in the best interests of the State consistent with field development. He concluded that none of the land was legally available for disposal by the State to the North Slope Borough under AS 29.18.190.*

**5.** The Commissioner's decision stated, in part: In any event, even if these lands (or any part of them) did fall within the category which the Division is permitted by AS 29.18.190 to grant to local governments, in my judgment it would not advance the best interests of the State to grant them away and diminish its direct control over them at this time. The economic usefulness and the environmental

integrity of the Prudhoe Bay Field depend in significant ways upon the efficient and unimpeded management by the State of Alaska of the surface estate of the leased tracts. I deem it critical and of paramount interest that the State retain full ownership of these lands, both surface and subsurface, in order to insure coherent land use planning during the producing life of the field and to preserve a constitutionally meaningful nexus to production, e. g., as lessor, in order to reinforce the State's regulatory authority over all activities of the lessees and of others using the land.

**6.** In view of our decision of this case on other grounds, we do not reach the issue of whether the lands were available for selection under AS 29.18.190.

ers and, with the approval of the commissioner, shall perform the duties necessary to protect the state's rights and interest in state lands . . . .

The legislative history of AS 29.18.190–200 indicates legislative recognition that the State would retain a measure of discretion to refuse borough land selections where necessary to protect the interests of the State.

The right of the borough to select state lands goes only to those which are "vacant, unappropriated and unreserved." The State Division of Lands has existing statutory authority to classify and reserve lands necessary to protect the interests of the State in surface rights, timber and mineral rights and fish and wildlife resources.

. . . . .

The value of lands and the nature of lands which may be selected by the borough will be largely a matter of policy to be determined in additional legislation. The intent of this section is to establish an overall policy which recognizes on behalf of local people the legitimate interest of boroughs in resources within their boundaries. It is intended as a broad policy statement, the value of which will depend, to a large extent, upon the good faith of subsequent legislatures and state administrations.[7]

■ Based on the foregoing, we conclude that the Commissioner has the authority to reject selection applications on . the basis that they are contrary to the best interests of the State. That authority should be exercised with due regard for the general state policy, also reflected in our Constitution,[8] favoring maximum local self-government. The enactment of AS 29.18.190–200 was unquestionably designed to further this goal.[9] The State, therefore, when it rejects a selection application as contrary to the best interests of the State, should be able to articulate specific and significant interests which justify according the State priority over the local government involved. We conclude for the reasons stated in part II of this opinion that the State has met this test in this case.

## II

■ The Borough contends that the Commissioner abused his discretion in rejecting the selections on the grounds that their conveyance to the Borough would be contrary to the best interests of the State. In making this contention, the Borough argues that we should substitute our judgment for that of the Commissioner on the merits of the question. That argument reveals a basic misconception of our role in reviewing agency action. It is only where the question is one of law that we will substitute our judgment for that of an administrative agency, and we will only do so then where the question of law does not involve agency expertise.[10] Where, as here, the question is as to the merits of agency action on matters committed to agency discretion, our scope of review is limited to whether the decision was arbitrary, unreasonable or an abuse of discretion.[11]

■ We believe that the Commissioner's decision in this case was not arbitrary, un-

---

7. House Journal Supplement, March 14, 1963 at 3–4.

8. Article X, Section 1 of the Alaska Constitution provides:

    *Purpose and Construction.* The purpose of this article is to provide for maximum local self-government with a minimum of local government units, and to prevent duplication of tax-levying jurisdictions. A liberal construction shall be given to the powers of local government units.

9. Representative John Rader's comprehensive explanation of House Bill 90 which contained AS 29.18.190–200 when enacted, and which accompanied the bill through the legislature,

stated: "Local government must be attractive, not only as a political theory, but as a practical reality. This demands the giving of funds, assets and revenues to local governments so that they can truly participate in the development of their own areas." House Journal Supplement, Feb. 25, 1963 at 7.

10. *State v. Aleut Corporation,* 541 P.2d 730, 737 (Alaska 1975); *Jager v. State,* 537 P.2d 1100, 1107 n. 23 (Alaska 1975).

11. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136, 153 (1971); *Moore v. State, supra* at 34 n. 12, 36 n. 20; *Jager v. State, supra* at 1107; *K & L Dis-*

reasonable or an abuse of discretion. Prudhoe Bay is apparently the largest known oil field on this continent. The State expects to obtain billions of dollars in revenues from it. Many plans and programs are dependent on these funds. State ownership of the surface estate of the lands in question may well facilitate state regulatory authority of the field and tend to protect state revenues. Conflicts between mineral lessees and fee owners regarding surface rights are foreseeable. The State has a legitimate interest in maintaining its fee ownership so that these conflicts do not reduce its anticipated revenues. Similarly, as the fee owner of the oil field lands, the State will be in a position to ensure a coherent and sensible placement of facilities necessary for the efficient operation of the oil field. It has a direct and obvious financial interest in doing so. In determining the State's interest in the surface estate to be "critical" and "paramount" to the Borough's, the Commissioner was making a decision which the legislature had entrusted to him. We have been presented with no basis which justifies our interference with it.

The Borough points out that in the past the Department of Natural Resources has granted borough selection applications where lands are subject to oil and gas leases. That fact, however, does not relieve the Commissioner of the duty to make a determination whether the best interests of the State will be served by a given conveyance in every case. The considerations which are the components of that decision will obviously differ depending on the character of the land and where it is situated and, therefore, what the Commissioner has done in the past in other areas did not establish a binding precedent.

AFFIRMED.

tributors, Inc. v. Murkowski, 486 P.2d 351, 358 (Alaska 1971); see Mobil Oil Corporation v.

Local Boundary Commission, 518 P.2d 92, 98 (Alaska 1974).